**Phyllis A. FIORANI, Appellant,**

v.

**John A. FIORANI, Respondent.**

**No. WD 37894.**

Missouri Court of Appeals,
Western District.

Dec. 2, 1986.

John E. Chick, Jr., Kansas City, for appellant.

Donald J. Lock, Gladstone, for respondent.

Before CLARK, C.J., and NUGENT and LOWENSTEIN, JJ.

NUGENT, Judge.

Phyllis A. Fiorani appeals from portions of the trial court's judgment entry nunc pro tunc of January 13, 1986, dissolving of her marriage to John A. Fiorani. She claims: (1) that the maintenance award of $440 per month is not sufficient to meet her needs, in particular her need to maintain health insurance coverage comparable to that provided by her husband during the marriage in view of her continuing health problems; (2) that the court improperly ordered her to pay the deposition costs of $258 and court costs when she demonstrated by substantial evidence that she could not afford to make such payments; and (3) that the court erred in failing to allocate the payment of outstanding medical bills totaling $11,957.013 even though it assigned all other debts of the marriage to John.

Applying the standard of review for court-tried cases of an equitable nature announced in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo.1976) (en banc), we sustain the trial court's judgment as to Phyllis' first claim of error, and reverse and remand with respect to the latter claims for the reasons set forth below.

On July 16, 1985, Phyllis filed a petition for legal separation, amended by interlineation at time of trial to a petition for dissolution of marriage. The trial court entered a decree of dissolution at the conclusion of the evidence on December 2, 1985, later amended as reflected in its judgment entry nunc pro tunc of January 13, 1986, dissolving the marriage, awarding maintenance in the amount of $440 per month to Phyllis, and disposing of the marital property.

In dividing the property, the court ordered that the marital residence be sold and that the proceeds from the sale of the home be divided equally between the parties. The order provided for judicial sale if the real estate were not sold within 180 days. John continued to live in the house after the dissolution and Phyllis took up residence elsewhere.

In addition to the maintenance award and her share of the proceeds from the eventual sale of the house, the court distributed to Phyllis a 1984 Buick LeSabre valued at $9,000; the Boatmen's North Hills Bank account, showing a balance of $200; thirty percent of John's pension benefits from

Owens-Illinois, Inc.; an oil lease valued at $500; and enumerated household items. The court assessed deposition costs of $258 and court costs for the dissolution action against Phyllis.

John received the Centerre Bank account with a balance of $1,267.58; his employee stock plan with Owens-Illinois, Inc.; the Owens-Illinois, Inc., group insurance policy, with face value of $102,000; a note in the sum of $1,000 and enumerated household goods.

The court ordered John to pay $2,000 in partial payment for Phyllis' attorney fees, and to assume the mortgage indebtedness, taxes, and insurance on the house until it could be sold. Also, John was required to pay the Wachovia Bank loan secured by his employee stock plan, the maintenance award of $440 per month and the following marital debts: (1) The sum of $8,510 to Altonized Federal Credit Union, constituting the outstanding debt for the 1984 Buick LeSabre awarded to Phyllis; (2) the sum of $959 to the Bank of Elgin; (3) the sum of $2,278 to Sears; (4) the sum of $603 to J.C. Penney; (5) the sum of $1,711.41 to the Jones Store; and (6) the sum of $200 to T.W.A.

The trial court made no findings concerning the medical debts incurred by Phyllis during the marriage, and issued no order allocating them. The parties presented conflicting evidence regarding the amount of those debts. John's exhibit C, which summarizes marital and non-marital property and liabilities, reflects unpaid medical bills in the amount of $2,659.90. Phyllis claims outstanding medical bills in the amount of $11,957.13, set forth in her exhibit 2, a summary of medical liabilities incurred during the marriage. The controversy centers in large part around a charge from North Kansas City Hospital pertaining to Phyllis' two hospitalizations for depression in 1985. Phyllis' summary shows a balance due of $10,382.70 on a charge of $13,305.14. John, on the other hand, testi-

fied that the only bill from North Kansas City Hospital of which he was aware required payment of $2,025.96. He stated that he was never billed in the amount of $13,305.14.

In support of her claim that the trial court erred in failing to assign the medical debts to John, Phyllis testified that John has not cooperated with her in processing her outstanding medical bills under the provisions of his insurance policy. For example, John neglected to follow up on certain bills Phyllis had submitted to Aetna concerning her 1985 hospitalization.[1] Phyllis further claimed that, though most of the bills had been received by the insurance company, doctors who sent bills directly to John complained that the bills were returned marked "addressee unknown." John also failed to forward the company's check for $56 to reimburse Phyllis for prescriptions.

As a result of John's uncooperativeness in insurance matters, Phyllis has received threats from collection agencies, and her psychiatrist refused to schedule a new appointment until the outstanding bill was paid.

The facts relating to Phyllis' claim that the maintenance award is insufficient to meet her needs require consideration of the parties' finances and Phyllis' history of poor health. Phyllis and John were married January 6, 1955, and separated more than thirty years later on June 27, 1985. At the time of the dissolution hearing, Phyllis was forty-seven years old and John was forty-nine. John has been employed by Owens-Illinois, Inc. for approximately thirty-one years, and has attained a position in middle management overseeing the company's high volume production operations. During the marriage, Phyllis devoted the majority of her time to raising the couple's three daughters, who were all emancipated at the time of the dissolution action. In addition, she worked at various times during the marriage as a claims ex-

---

**1.** Neither party offered proof of the existence or amount of the hospital debt independent of the financial summaries prepared for trial.

aminer, a bookkeeper, a saleswoman, an apprentice pharmacist and a marketing assistant. According to John, Phyllis had never maintained full-time employment outside the home for more than two years at a time.

At the time of the dissolution hearing, Phyllis was employed by Accountemps, a temporary personnel service, where she earned between $4.50 and $5.50 per hour filling in as an account clerk for various employers. Although her schedule was not predictable, she generally worked a forty hour week. Also, Phyllis anticipated continuing to do seasonable tax work for H & R Block as she had done in past years. Phyllis had no doubt that she could find full time employment in the accounting or tax fields as soon as she was settled emotionally and mentally. However, she did not feel she was stable enough to seek full time employment at the time of the hearing.

John's gross wage of $4,547.50 per month amounted to $2,423.50 per month after deductions which include a mandatory direct payment of $380 per month to Altonized Credit Union for the Buick automobile. John testified that after subtracting $1,173 for his normal monthly living expenses and the $1,107 mortgage payment on the house, as well as monthly payments to Sears, T.W.A. and other creditors totaling $548, he would suffer a deficit of $404 per month.[2]

Prior to the dissolution of marriage, the parties earned a combined income of $98,815 in 1984, of which Phyllis earned about $2,100. John received a tax refund of approximately $4,600 that year. In 1983, the couple's combined income was $52,624, and in 1982, they jointly earned $50,449.

On appeal, Phyllis requests that her maintenance award be increased so that she can purchase insurance coverage comparable to John's policy which covered the many health problems she suffered during the marriage. These problems include a gall bladder operation, a hysterectomy, a tubal ligation, two bone grafts on the shoulder, a surgical manipulation of a frozen shoulder, surgery for removal of a metal plate, an additional anticipated surgery on a foot, a recurring kidney and bladder infection, colitis, migraine headaches, a fractured tailbone, and lower back ailments. Phyllis has been diagnosed as manic depressive, and had been hospitalized at least fourteen times during the marriage for mental problems, including two hospitalizations during the year 1985 for depression and attempted suicide.

Phyllis stated that she is not a cripple and that her suggested disabilities do not prevent her from doing any particular activity except when they occur temporarily. The colitis interferes with her work to the extent that she occasionally has to leave while working with a client. Due to the hysterectomy, she must now take an estrogen supplement. The two bone grafts that Phyllis has undergone will cause some limitations on the use of her left arm until the arm has completely healed. She contemplated an additional surgery to correct a planter's wart-like condition in one foot, requiring an estimated six weeks' recovery time. Phyllis testified that her migraine headaches occur in the home environment rather than at work, and that she has missed work only four to five times in nearly ten years. Also, Phyllis had no particular problem with her lower back at the time she testified. She had already been discharged by the physicians for removal of a metal plate. These conditions do not interfere with her recreational activities, which include square dancing, bowling, and visits to a fitness center on the recommendation of her orthopedist.

Phyllis testified that she would probably never be advised to discontinue her medication for manic depression. However, she had gone as long as seven years between

---

**2.** John's calculations showing a deficit of $404 each month were made prior to the trial court's judgment entry and, therefore, do not reflect the maintenance award of $440 per month or the payment of $2,000 for Phyllis' attorney fees. Presumably, John's arrearage will more than double in light of the court's decree.

manic depressive episodes, and she felt that the episodes of manic depression in 1985 were "situational" depression resulting from the stress of the deterioration of the marriage. Phyllis explained that she had no way of gauging the frequency of the periods of manic depression.

Phyllis contends that the $440 per month maintenance award combined with the $659 maximum income she could earn working for Accountemps on a full-time basis still falls short of her listed monthly expenses of $1,197, not including health insurance coverage. Should Phyllis choose the conversion policy offered by Aetna and John's employer, she would need to add the premium payment amounting to $103 per month to the list of expenses, bringing her monthly deficit to $201.[3]

John's employer, Owens-Illinois, Inc., produced a "tailor made insurance policy" for salaried individuals in conjunction with Aetna, which John continued to maintain. This policy covered all the surgeries, either in whole or in part, that Phyllis ever experienced during the marriage. In contemplation of the dissolution of marriage, Phyllis obtained information about converting the company policy to an individual policy. Phyllis testified that the coverage offered in the conversion policy "seems to be very inadequate." She stated that the conversion policy was not comparable to the original group employment policy in that the dollar limitations were lower, "especially in the areas where I need coverage." She offered no other evidence to illustrate these inadequacies or limitations.

## I.

In her first point, Phyllis claims that the trial court abused its discretion by ordering a maintenance award insufficient to meet her demonstrated needs, including the need for insurance coverage comparable to that provided through John's employer which she enjoyed during the marriage, in light of her continuing mental and physical health problems.

Phyllis argues that while she is not able to improve her financial condition to alleviate the monthly deficit, John could easily increase his disposable income to meet an increased maintenance payment by voluntarily changing his conduct. To this end, she suggests that John change the number of tax exemptions he presently claims to decrease the income withheld from his paycheck, and also that John move to a less expensive dwelling than the marital home, which could then be rented to produce additional income until it is sold.

Under the standard of review set forth in *Murphy v. Carron, supra* at 32, we are constrained to affirm the decision of the trial court "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." Accordingly, Phyllis' first point must be denied.

A trial court may grant a maintenance award if it makes certain findings required by § 452.335.[4] Subsection 1 requires in pertinent part a finding that the spouse seeking maintenance lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, and is unable to support himself through appropriate employment. Subsection 2 sets forth the factors which the court must consider in determining the amount and duration of the maintenance order which the court deems just:

(1) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently[;] ...

(2) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) The standard of living established during the marriage;

---

3. In her appellate brief, Phyllis miscalculates the deficit as $210 per month, likely a typographical error.

4. All sectional references are to the Revised Statutes of Missouri, 1978, as amended.

(4) The duration of the marriage;

(5) The age, and the physical and emotional condition of the spouse seeking maintenance;

(6) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance; and

(7) The conduct of a party seeking maintenance during the marriage.

In rejecting Phyllis' contention that the maintenance award should be sufficient to provide her with insurance comparable to her insurance coverage during the marriage, we rely upon *Brueggemann v. Brueggemann*, 551 S.W.2d 853, 857 (Mo.App. 1977), which states that the term "reasonable needs" as used in § 452.335.1 does not automatically equal the standard of living established during the marriage. Nothing in the statute requires the court to ensure that the maintenance awarded meet a spouse's customary insurance requirements. Here, the trial court considered copious evidence of Phyllis' physical and mental conditions in making the determination required by § 452.335.2. We cannot say that the trial court abused its discretion in fashioning the maintenance award of $440 per month.[5]

Furthermore, the fact that the maintenance award falls short of Phyllis' monthly expenses by $201 does not necessarily signal an abuse of discretion. *Hoffmann v. Hoffmann*, 676 S.W.2d 817, 828 (Mo.1984) (en banc). In *Rasmussen v. Rasmussen*, 627 S.W.2d 117, 120 (Mo.App.1982), this court determined that § 452.335 does not require the trial court to award maintenance sufficient to meet every need of the receiving spouse, even where the husband has adequate resources to provide a greater portion of the wife's needs than the court has ordered. *See also Boone v. Boone*, 637 S.W.2d 249, 250 (Mo.App.1982). In the present case, evidence exists which, if believed, would indicate that John, who himself faced a substantial monthly financial deficit, would not be able to afford a greater maintenance award. We hold the maintenance award of $440 per month was within the broad discretion of the trial court and reflects appropriate consideration of the factors prescribed by § 452.335.[6]

## II.

■ In her second point, Phyllis claims that the trial court erred by ordering her to pay the $258 deposition costs and court costs when the record reflected substantial

---

**5.** *See* Krauskopf, *Maintenance: A Decade of Development*, 50 Mo.L.Rev. 259 (1985). In addressing the impact of physical and mental health conditions which adversely affect the ability to support oneself, Professor Krauskopf stated:

> The high percentage of appealed cases in which health is an issue suggests that attorneys on both sides always should investigate possible evidence on this factor. However, once the record shows health problems that do lessen the ability to earn, appeal to challenge an award probably is futile except on the grounds of inability to pay. *Id.* at 283.

**6.** While the courts of appeal have, on occasion, ordered that an inadequate maintenance award be increased, such instances are rare. *See In re Marriage of Runez*, 666 S.W.2d 430, 433 (Mo. App.1983); *Cregan v. Clark*, 658 S.W.2d 924, 928–29 (Mo.App.1983). In the *Runez* case, the wife had not worked during the marriage and had no marketable skills or work experience. She was given custody of the couple's five minor children. The court of appeals increased the maintenance award from $300 to $1,000 per

month because the wife "had no income producing property, received none from the marital property, and there is no reasonable possibility that she will be able to earn any substantial sums in the near future." The court also increased the child support award to $300 a month per child. The increased maintenance and child support awards combined, totaling $2,500, fall far short of meeting the $4,504.89 monthly expenses of Mrs. Runez and her children.

In *Cregan, supra,* this court ordered that the maintenance award of $500 per month be increased to $1,000 per month on facts more compelling than those presented in the case at bar: Mrs. Clark, forty-one years of age at the time of the trial and the custodian of children, had never been employed outside the home, and had no training or experience which would qualify her for any specialized employment. In spite of the increased maintenance and child support, Mrs. Clark would have to earn another $1,539 per month to meet her stated expenses.

evidence of her inability to pay. Without reaching the question of the weight a trial court must give to a party's ability to pay in making a discretionary allocation of costs under § 452.355, we remand this issue because the trial court's order was contrary to its findings on the matter.

In its judgment entry nunc pro tunc of January 13, 1986, the court made a detailed record of its findings which include the statement that "the costs of this action should be assessed against the respondent [John]." Yet, in spite of its findings, the court ordered that the deposition costs and the costs of the action be assessed against Phyllis. We direct the trial court to reconsider its assessment of costs against Phyllis in light of the inconsistency between the findings and the order.

### III.

 We also remand Phyllis' final claim to the trial court with instructions to determine the dollar amount of the outstanding medical bills incurred during the marriage, and to allocate the payment of this indebtedness.

Because the debts of the parties do not constitute marital property cognizable under § 452.330, the trial court's failure to distribute them does not prevent the finality of the judgment. *N.J.W. v. W.E.W.*, 584 S.W.2d 148, 151 (Mo.App.1979). Nonetheless, the Missouri Courts of Appeal have suggested that, in order to finally resolve the parties' difficulties and to avoid future litigation, the better practice would be to allocate payment of the debts at the time the property is distributed. *Id.; Flach v. Flach*, 645 S.W.2d 718, 719–20 (Mo.App. 1982).

According to *Alvino v. Alvino*, 659 S.W.2d 266, 272 (Mo.App.1983), "[a] court has the authority to distribute debts in the sense that one party may be assigned the primary duty to pay a debt and to hold the other harmless thereon."[7] Here, the trial court properly exercised its authority with respect to all debts of the marriage other than the medical debts. The instant facts present a strong case for requiring the trial court to complete the process it began by allocating the payment of the medical debts, in light of the inability of the parties to cooperate in processing the medical insurance claims. As stated in *Fausett v. Fausett*, 661 S.W.2d 614, 618 (Mo.App. 1983), "the ultimate goal of a decree of dissolution is to place each of the former spouses in an independent, self-sufficient status." The assignment of marital debts is consonant with the philosophy of the Dissolution of Marriage Act[8] and is a method readily available to free the parties from future embroilment.

In the interest of laying litigation to rest and settling the parties' rights, Rule 84.14 permits the appellate court to render or modify a judgment where no further factual adjudication is necessary, *see also Alvino, supra; Flach, supra*. In the present case we remand because the court did not determine the amount of the disputed medical indebtedness. Since the reallocation of debt may change the equities in this case, we direct the trial court to consider its effect upon the remaining orders, including the property distribution and maintenance.

Accordingly, we affirm the trial court's maintenance award of $440 per month, and we reverse and remand Phyllis' claims regarding the assessment of costs and the allocation of indebtedness.

All concur.

---

7. In the *Alvino* case, *supra*, 659 S.W.2d 266, the trial court granted judgment against the husband in favor of three doctors and a private educational institution. The appellate court found that the trial court erred in entering judgment in favor of the various creditors, but implied that by so doing, the trial court intended merely to assign to the husband the primary duty to pay the debts, and to hold the wife harmless thereon. The appellate court amended the judgment accordingly as there was no dispute as to the facts pertaining to the debts. *Id.* at 272.

8. §§ 452.300–452.415, which went into effect January 1, 1974.